# United States Court of Appeals
## For the Eighth Circuit

_____

No. 18-1636

_____

United States of America

*Plaintiff - Appellee*

v.

Alfredo Valquier

*Defendant - Appellant*

_____

Appeal from United States District Court
for the District of Nebraska - Omaha

_____

Submitted: May 16, 2019
Filed: August 23, 2019

_____

Before COLLOTON, MELLOY, and SHEPHERD, Circuit Judges.

_____

MELLOY, Circuit Judge.

Defendant Alfredo Valquier ("Valquier") appeals following his conviction for conspiring to distribute methamphetamine. He argues the district court[1] plainly erred by admitting statements he made prior to receiving <u>Miranda</u> warnings and by

_____

[1]The Honorable Robert F. Rossiter, Jr., United States District Judge for the District of Nebraska.

admitting others' statements in violation of the Confrontation Clause. We reject his arguments and affirm the judgment of the district court.

## I.

Officers discovered over thirty-five pounds of methamphetamine during a traffic stop. The driver of the vehicle, Blanca Avila De Vega, agreed to participate in a controlled delivery in Omaha. Alejandro Buendia-Ramirez and Valquier's brother, Carlos Valquier ("Carlos"), arrived at the delivery location with a bag containing over $90,000, which they exchanged for a portion of the drugs. Officers arrested Carlos and Buendia-Ramirez, gave them Miranda warnings, and interviewed them. Carlos directed officers to a house he claimed to have recently rented and signed a form consenting to a search of the house. Carlos also indicated that his brother was involved but did not give the officers Valquier's name.

After officers arrived at the rental house, established a perimeter, and began a search, Valquier arrived at the house. Officers approached Valquier, placed him in handcuffs, and asked him to sit on the curb. Soon, a federal investigator named Vincik arrived. Vincik asked Valquier who he was and what he was doing. Valquier gave Vincik his name and stated he was considering renting the house. Recognizing Valquier's last name and believing him to be untruthful regarding his purpose, Vincik accused Valquier of being involved in the drug sales and coming to the house to retrieve drugs or money. In response, Valquier "kind of hung his head." Vincik then read him his Miranda warnings and placed him in a squad car. The house was mostly empty, making it obvious that no one was living there. In an empty television cabinet, however, officers found $19,000. Officers concluded the conspirators were using the house as a stash house.

Valquier was charged with conspiring to distribute methamphetamine. He moved to suppress testimony describing the statements and gestures he made to

-2-

Vincik outside the rental house prior to receiving his <u>Miranda</u> warnings. A magistrate judge recommended denying the motion, holding that although Valquier was in custody, the questions Vincik asked did not rise to the level of an interrogation. The magistrate judge interpreted the questions as akin to permissible and benign requests for information not related to an investigatory purpose. Valquier failed to object to the report and recommendation, which the district court subsequently adopted in full.

At trial, Vincik and other officers testified as did two co-conspirators, Avila De Vega and Buendia-Ramirez. Valquier renewed his objections as raised in his motion to suppress. In addition, he objected to many facets of the officers' and co-conspirators' testimony on hearsay or foundation grounds. He asserted no objections based on the Confrontation Clause.

An officer described the initial traffic stop, the discovery of the drugs, and the controlled delivery. Officer Vincik testified next. Over objections, Vincik testified that Carlos told officers he had rented the house and consented to a search of the house and that the landlord of the property stated Carlos had rented the house. The prosecution introduced a signed consent form, and Officer Vincik testified that the signature on the search consent form was Carlos's signature even though Vincik had not witnessed Carlos sign the form. Vincik described Valquier's pre-<u>Miranda</u> statements at the rental house and Valquier's act of "hanging his head" after Vincik accused him of being involved with drugs. In addition, Vincik explained that all co-conspirators were arrested with one or more phones, some of which were inexpensive "burner phones." Finally, Vincik testified that forensic searches of the phones revealed that Valquier's phone had called Buendia-Ramirez's phone twice before the controlled delivery and several times shortly after Buendia-Ramirez's arrest.

Buendia-Ramirez testified that he came to Nebraska from Mexico believing he would have work as a painter. He explained that a man in Mexico named El Tio had paid for him to come to Nebraska. Soon after arriving, he realized there was no

painting job—Valquier picked him up from the airport, took him to a hotel, and paid for a room. There, several people, including Valquier and Carlos, began bringing money to the room. Buendia-Ramirez stated that Valquier and Carlos brought a total of approximately $15,000–$20,000 in smaller amounts and told him to count and hold the money. At one point, Valquier and Valquier's mother took him to the rental house where he spent a night. Buendia-Ramirez also testified that, at El Tio's instruction, Buendia-Ramirez took money to the transaction that ultimately turned out to be the controlled delivery. Buendia-Ramirez described the $90,000 used for the transaction as accumulated funds brought to Buendia-Ramiriez by Valquier, Carlos, their mother, and others.

Avila De Vega testified that she had delivered drugs to Valquier in Omaha on a separate occasion prior to the controlled delivery. Another officer, Officer Reisz also testified. He had been involved in arranging, and was present for, the controlled delivery. He testified about the controlled delivery and his investigation. Over objection, he testified that the rental-house landlord had stated that Carlos rented the house. Also over objection, he testified that he talked to the manager of the hotel where Valquier had first rented a room for Buendia-Ramirez. The prosecution introduced a print-out of the room registration that included a copy of Valquier's Nebraska driver's license as provided at check-in.

The jury convicted Valquier, and Valquier appeals.

II.

Valquier neither objected to the report and recommendation nor raised any Confrontation Clause objections at trial. As such, he asserts that our review is for plain error. Before the court will exercise its discretion to provide relief under plain error review, there must be an error that is "clear or . . . obvious" and "affec[ts] substantial rights." United States v Olano, 507 U.S. 725, 734 (1993) (internal

-4-

quotation marks and citations omitted). "[I]n the ordinary case," an error affects a defendant's substantial rights if the defendant can "show a reasonable probability that, but for the error, the outcome of the proceeding would have been different." Molina-Martinez v. United States, 136 S. Ct. 1338, 1343 (2016) (internal quotation marks and citation omitted).[2]

Valquier first argues the district court erred by failing to suppress Officer Vincik's testimony describing Valquier's pre-Miranda statements and actions. "Miranda warnings are required when a suspect is interrogated while in custody." United States v. Aldridge, 664 F.3d 705, 711 (8th Cir. 2011). The government concedes Valquier was in custody when seated on the curb in handcuffs. Because Officer Vincik did not merely ask Valquier his name, but questioned him as to his purpose based on information Vincik had previously developed, we assume for the sake of our analysis that Officer Vincik interrogated Valquier. See United States v. Cowan, 674 F.3d 947, 958 (8th Cir. 2012) ("A question is an interrogation if it is reasonably likely to elicit incriminating information. Interrogation does not include request[s] for routine information necessary for basic identification purposes." (alteration in original) (internal quotation marks and citations omitted)). We therefore assume it was error to allow Officer Vincik to testify regarding Valquier's false explanation for his presence and his eventual hanging of his head in an apparent show of defeat at having been caught.

We need not opine as to whether any such error was clear or obvious because the admission of this testimony did not affect Valquier's substantial rights. Through

---

[2]Valquier could have argued for de novo review of legal conclusions regarding the Miranda rule, but any error would be harmless in any event. See United States v. West, 589 F.3d 936, 938 (8th Cir. 2009) ("[B]ecause Mr. West did not object to the magistrate's findings of fact we review them for plain error only. But we subject the district court's legal conclusions to de novo review regardless of whether objections are filed." (citation omitted)).

other testimony and evidence, the jury learned that Valquier arrived at the rental house shortly after the controlled delivery and that his phone had placed several calls to Buendia-Ramirez's phone close in time to the controlled delivery. The jury also learned that officers found $19,000 at the rental house, but little else, demonstrating clearly that it was, in fact, a stash house. Co-conspirator testimony was particularly damaging. Avila De Vega testified that she had delivered drugs to Valquier in Omaha on a prior occasion. Buendia-Ramirez testified that, prior to the day of the controlled delivery, Valquier had picked him up from the airport, rented him a hotel room, and repeatedly delivered cash to him at that hotel room, some of which was later used in the controlled delivery. Buendia-Ramirez also testified that Valquier had taken him to the rental house to stay for a night. Given this other evidence, we find no "reasonable probability that, but for the error, the outcome of the proceeding would have been different" had the jury not heard Vincik's testimony describing the pre-Miranda statements. Molina-Martinez, 136 S. Ct. at 1343.

Valquier next argues several alleged Confrontation Clause violations merit reversal. Although he lodged hearsay and foundation objections at trial, he limits his argument on appeal to the Confrontation Clause. His arguments, however are not entirely clear and he does not fully explain his theory of how any alleged violations affected his substantial rights. Valquier appears to challenge Officer Vincik's testimony that: (1) Carlos claimed to have rented the house, (2) Carlos consented to the search of the house, (3) Carlos signed the consent form, (4) Carlos led officers to the house, and (5) the landlord stated Carlos rented the house. Valquier also appears to challenge Officer Reisz's testimony that: (1) the landlord stated Carlos rented the house, (2) the hotel manager printed out a form showing Valquier's driver's license in response to questions about the room rented for Buendia-Ramirez, and (3) Buendia-Ramirez stated he stayed at the hotel.

"As made clear in Crawford[v. Washington, 541 U.S. 36, 51 (2004)], the Confrontation Clause applies only to testimonial hearsay statements." United States

v. Holmes, 620 F.3d 836, 841 (8th Cir. 2010). The government argues Officer Vincik's description of Carlos's statements concerning the rental house was offered to describe the path of the investigation—why and how the investigation moved from the site of the controlled delivery to the purported stash house. The Confrontation Clause is not violated by the introduction of out-of-court statements by persons not present for trial if the out-of-court statements are not offered for the truth of the matter asserted. See Crawford, 541 U.S. at 59 n.9 ("The Clause also does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted."). Regardless, even if we were inclined to view Officer Vincik's testimony concerning Carlos, the rental house, and the landlord as statements offered for the truth of the matters asserted therein, no such statements affected Valquier's substantial rights. The purpose of the rental house was obvious based on its contents, Buendia-Ramirez's testimony, and the path of the investigation. Any possible inferences or conclusions based on the truth of the matters asserted in the statements officer Vincik described were cumulative and posed no reasonable probability of altering the outcome of the trial. We reach the same conclusion as to any possible error in the admission of Officer Reisz's testimony regarding the landlord, the hotel manager, and Buendia-Ramirez.

Finally, even if we were to reach the final prong of the plain error analysis, nothing about the asserted evidentiary errors would merit relief. Relief pursuant to plain error review, after all, is "permissive, not mandatory," Olano, 507 U.S. at 735, and we "should correct a plain forfeited error affecting substantial rights if the error seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings," id. at 736 (alteration in original) (internal quotation marks and citations omitted). No such concerns are present in this case.

We affirm the judgment of the district court.

_____